**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA

      Plaintiff,

vs.                                                                 No. CR 21-0280 JB

ROBERT ORTIZ,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Objections to the Presentence Report and Sentencing Memorandum, filed December 7, 2021 (Doc. 34)("Objections").[1]  The primary issue is whether, while engaged in carjacking, Ortiz "otherwise used" a dangerous weapon, as the United States Sentencing Guidelines ("U.S.S.G") defines that term, to justify a 4-level sentencing enhancement under § 2B3.1(b)(2)(D), or whether Ortiz merely "brandished" a dangerous weapon pursuant to U.S.S.G. § 2B3.1(b)(2)(E), for a 3-level sentencing enhancement. The Court concludes that Ortiz "otherwise used" a dangerous weapon, justifying a 4-level enhancement under § 2B3.1(b)(2)(D).  The Court, therefore, overrules Ortiz' objection.

## <u>FINDINGS OF FACT</u>

The Court takes its facts from the Presentence Investigation Report, filed November 23, 2021 (Doc. 30)("PSR"), the Objections, the Plea Hearing, <u>see</u> Plea Minute Sheet, filed August 4, 2021 (Doc. 24), and the Indictment, filed March 12, 2021 (Doc. 4).  The Court makes its findings

---

[1]Ortiz only makes one objection to the Presentence Investigation Report, although the document is entitled, "Defendant's Objections to the Presentence Report and Sentencing Memorandum."

by a preponderance of the evidence.  See United States v. Williams, No. CR. 17-2556 JB, 2020 WL 4016108, at *6 (D.N.M. July 16, 2020)(Browning, J.)(citing United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)).  Accord United States v. Zapata, 546 F.3d 1179, 1192 (10th Cir. 2008)("The district court's determination of drug quantity is a factual finding that must be supported by a preponderance of the evidence and is reviewed for clear error.").  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.   See   United States v. Banda,   168   F.   App'x   284,   289   (10th   Cir. 2006)(unpublished)[2](stating that "there is no prohibition on considering hearsay testimony at sentencing, provided it bears indicia of reliability").  The evidence and information upon which the Court relies must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable

---

[2]United States v. Banda is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Banda, 68 F. App'x 284 (10th Cir. 2006), United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008), United States v. Hendrickson, 592 F. App'x 699 (10th Cir. 2014), and United States v. Peraza, 240 F. App'x 788 (10th Cir. 2007), have persuasive value with respect to a material issue and will assist the Court in its disposition of this MOO.

accuracy.").

1.      On November 14, 2020, in the evening, R.M. and his friend, A.M., went to Spin Cycle laundromat on Central Avenue, in Albuquerque, New Mexico.[3]  See PSR ¶ 6, at 3.

2.      R.M. stayed in A.M.'s car, a white 2014 BMW 28I, while A.M. went into Spin Cycle.  See PSR ¶ 6, at 3.

3.      R.M. saw Ortiz "walk around the laundromat multiple times."  PSR ¶ 7, at 3.

4.      Ortiz "opened the unlocked driver's side door of A.M.'s vehicle and pointed a black handgun at R.M., while demanding the keys."  PSR ¶ 7, at 3.

5.      R.M. told Ortiz that he did not have the keys.  See PSR ¶ 7, at 3.

6.      A.M. saw Ortiz walk up to the laundromat door, which was locked.  See PSR ¶ 6, at 3.

7.      There were no employees at Spin Cycle at the time.  See PSR ¶ 7, at 3.

8.      Ortiz knocked on several of the laundromat's locked doors before A.M. met Ortiz at an unlocked door.  See PSR ¶ 6, at 3.

9.      Ortiz "pointed a black handgun at A.M.'s chin and demanded his keys."  PSR ¶ 6, at 3.

10.      The gun Ortiz used was a BB gun.  See PSR ¶ 9, at 4.

11.      A.M. gave Ortiz the keys and told R.M. to get out of the car.  See PSR ¶ 6, at 3.

12.      Ortiz took the keys, got in the vehicle, and "fled . . . westbound on Central."  PSR ¶ 7, at 3.

---

[3]Central Avenue was part of historic Route 66, which runs east to west through the center of Albuquerque, passing through Old Town, Downtown, and Nob Hill.  See Historic Route 66, available at https://www.visitalbuquerque.org/about-abq/route-66/#history (last visited December 13, 2021).

13.     "Neither A.M. nor R.M. were injured," but "they thought the suspect was going to shoot them when the handgun was pointed at them."  PSR  ¶ 7, at 3.

14.     On November 18, 2020, New Mexico State Police ("NMSP") officers observed A.M.'s BMW run a red light.  See PSR ¶ 8, at 3.

15.     NMSP officers tried to "initiate a traffic stop; however, a vehicle pursuit ensued, registering speeds of up to 110 mph."  PSR ¶ 8, at 3-4.

16.     An NMSP officer deployed "stop sticks" on the BMW on northbound Interstate 25 near Mile Post 238, but the BMW continued to travel northbound and turned onto U.S. Highway 550, "driving westbound in the eastbound lanes of travel, towards opposing traffic, almost colliding with opposing traffic."  PSR ¶ 8, at 4.

17.     Ortiz disposed of the BB gun during the vehicle chase.  See PSR ¶ 9, at 4.

18.     The BMW finally stopped "in the median of U.S. Highway 550 and Camino Del Pueblo."  PSR ¶ 8, at 4.

19.     Sandoval Sherriff's Office deputies saw Ortiz and another individual flee from the BMW on foot.  See PSR ¶ 8, at 4.

20.     Ortiz presented "the wallet of the BMW's registered owner, including his driving license" to a police officer.  PSR ¶ 8, at 4.

21.     Ortiz told the officer that the wallet belonged to him.  See PSR ¶ 8, at 4.

22.     The BB gun was not recovered.  See PSR ¶ 10, at 4.

## PROCEDURAL HISTORY

On December 10, 2020, Plaintiff United States of America filed the Criminal Complaint (Doc. 1)("Complaint").  In the Complaint, the United States alleges that Ortiz violated 18 U.S.C. § 2119: Carjacking.  See Complaint at 1.  On March 12, 2021, a federal grand jury charged Ortiz

with violating 18 U.S.C. § 2119: Carjacking, see Indictment at 1, and a warrant was issued for Ortiz' arrest that same day, see Arrest Warrant, filed March 12, 2021 (Doc. 5). Ortiz was arrested on April 7, 2021. See Arrest of Robert Ortiz, filed April 7, 2021 (text only entry). Ortiz pled not guilty at his arraignment on April 12, 2021, and was remanded to the custody of the United States' Marshals pending trial. See Clerk's Minute Sheet, filed April 12, 2021 (Doc. 16). On August 4, 2021, Ortiz pled guilty to Carjacking, in violation of 18 U.S.C. § 2119. See Plea Minute Sheet at 1; Indictment at 1.

      1.      **The PSR.**

The United States Probation Office ("USPO") filed the PSR on November 23, 2021. See PSR at 1. For Ortiz' Carjacking offense, the USPO calculates that, under U.S.S.G. § 2B3.1(a), Ortiz' base offense level for Robbery is 20. See PSR ¶ 15, at 5. The USPO adds 6 levels for Specific Offense Characteristics: 4 levels pursuant to U.S.S.G. § 2B3.1(b)(2)(D), because "a dangerous weapon was otherwise used;" and 2 levels pursuant to U.S.S.G. § 2B3.1(b)(5), because "the offense involved carjacking," PSR ¶¶ 16-17, at 5 (quoting U.S.S.G. § 2B3.1(b)(2) and (5)). The USPO calculates an Adjusted Offense Level of 26. See PSR ¶ 21, at 5. The USPO subtracts 2 levels under U.S.S.G. § 3E1.1(a), because "[t]he defendant has clearly demonstrated acceptance of responsibility for the offense," and subtracts another level under U.S.S.G. § 3E1.1(b), because "[t]he defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty." PSR ¶¶ 23-24, at 5. The USPO, therefore, calculates Ortiz' Total Offense Level as 23. See PSR ¶ 25, at 5.

Next, the USPO calculates Ortiz' subtotal criminal history score of 4. See PSR ¶ 31, at 8. Under U.S.S.G. Chapter 5, Part A, a criminal history score of 4 establishes a criminal history category of III. See PSR ¶ 32, at 8. The USPO states that, under 18 U.S.C. § 2119, the statutory

maximum term of imprisonment for Carjacking is 15 years, see PSR ¶ 61, at 16, and that the guideline imprisonment range for "a total offense level of 23 and a criminal history category of III" is 57 months to 71 months, PSR ¶ 62, at 16. The USPO states that the guideline range for a term of supervised release for a Class C Felony is one to three years, see PSR ¶ 65, at 16 (citing U.S.S.G. § 5D1.2(a)(2)), with a statutory maximum of three years, see PSR ¶ 64, at 16 (citing 18 U.S.C. § 3583(b)(2)). The USPO calculates that, although under 18 U.S.C. § 3561(c)(1), Ortiz is eligible for one to five years' probation for a Class C Felony, see PSR ¶ 66, at 16, and because the applicable guideline range for Ortiz' sentence is in Zone D, Ortiz is ineligible for probation according to U.S.S.G. § 5B1.1, n.2, see PSR ¶ 67, at 16. The USPO states that the maximum fine the Court could be impose is $250,000.00 under 18 U.S.C. § 3571(b), see PSR ¶ 69, at 16, and that a special assessment of  $100.00 fine is mandatory under the general provisions of 18 U.S.C. § 3013(a)(2)(A), see PSR ¶ 70, at 16. According to the USPO, the fine range for Ortiz' offense under the guidelines is between $20,000.00 and $200,000.00. See PSR ¶ 71, at 17 (citing U.S.S.G. § 5E1.2(c)(3)). The USPO states that restitution is mandatory under 18 U.S.C. § 3663A and under U.S.S.G. § 5E1.1, but that the victims have not yet made a request for restitution. See PSR ¶¶ 73-74, at 17. The USPO does not identify any factors that warrant a departure from the sentencing guideline range, see PSR ¶ 77, at 17, but lists several factors under 18 U.S.C. § 3553(a)(1)-(7) that "may warrant a sentence outside of the advisory guideline system," see PSR ¶ 78, at 17-18. The USPO calculates a guideline imprisonment range of 57 to 71 months. See PSR ¶ 78, at 19.

### 2.    **The Objections.**

On December 7, 2021, Ortiz objected to the PSR. See Objections at 1. In particular, Ortiz objects to the "four (4) level enhancement pursuant to § 2B3.1(b)(2)(D)" and argues that the "correct Specific Offense Characteristic is pursuant to U.S.S.G. § 2B3.1(b)(2)(E) for a three (3)

level enhancement." Objections at 1.  Ortiz does not challenge that his offense involves carjacking, nor does he dispute that he pointed a BB gun at the victims and that they were concerned for their safety.  See Objections ¶ 1, at 1.  Ortiz argues that he "simply brandished" the BB gun, "but did not 'otherwise use' it within the meaning of § 2B3.1."  Objections ¶ 2, at 2 (quoting U.S.S.G. § 2B3.1(b)(2)(D)).

Ortiz asserts that the "relevant definition of brandished includes 'the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person.'"  Objections ¶ 3, at 2 (quoting U.S.S.G. § 1B1.1, Application Note 1(C)).  Ortiz also states that "otherwise used means 'the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.'"  Objections ¶ 4, at 2 (quoting U.S.S.G. § 1B1.1, Application Note 1(J)).  Ortiz does not dispute that a BB gun is a dangerous weapon, as U.S.S.G. § 1B1.1, Application Note 1(H) defines that term, but argues that his conduct was "nothing more than brandishing and displaying the BB gun to intimidate.  He did not use the BB gun as a club or discharge[] it."  Objections ¶ 4, at 2.

Ortiz argues that the "requirement of proportionality" supports only a 3-level enhancement and contrasts his use of the BB gun with a "typical otherwise used case . . . where the . . . gun was used as a club to 'pistol whip' the victim."  Objections ¶ 6, at 2.  Ortiz argues that such conduct is more egregious than his and that he should not receive the same sentence as someone who engages in that kind of egregious conduct.  See Objections ¶ 6, at 2-3.  On this basis, Ortiz requests an Adjusted Offense Level of 25 and a Total Offense Level of 22, for which the guideline range is 51 to 63 months.  See Objections ¶ 7, at 3.

**3.      Addendum.**

The USPO filed an addendum to the PSR on December 10, 2021.  See Addendum to the

Presentence Report at 1, filed December 10, 2021 (Doc. 35)("PSR Addendum").  The USPO

responds to Ortiz' Objections, arguing that Ortiz' "admitted conduct of pointing the weapon at the

victims amounts to 'otherwise using' the weapon in a manner meriting the four (4) level

enhancement pursuant to § 2B3.1(b)(2)(D)."  PSR Addendum at 1.  The USPO argues that

> The pointing of the weapon at the victims, including at one of the victims' head,
> demanding the keys to the car amounts to "otherwise used" rather than just
> brandishing, as defense counsel asserts, as the defendant's actions were more than
> brandishing, displaying, or possessing a firearm or other dangerous weapon. . . .
> The defendant's conduct surpassed mere brandishing by virtue of pointing the
> weapon at the victim's head.

PSR Addendum at 1-2.

## LAW REGARDING THE SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States

of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-

473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.  In excising

the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact,

including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors

that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past,

in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary" to comply with four statutorily defined purposes enumerated in

18 U.S.C. § 3553(a)(2):

> (A)      to reflect the seriousness of the offense, to promote respect for the law,
>           and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

[A] defendant who has been found guilty of an offense described in any Federal statute . . .  shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) the Guidelines; (ii) the offense's nature and the nature of the defendant's character; (iii) the

available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit

similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States

Sentencing  Commission  policy  statements  in  effect  on  the  date  of  sentencing.     See

18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the United

States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of

several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v.

United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the

Sentencing Commission examined tens of thousands of sentences and worked with the help of

many others in the law enforcement community over a long period of time in an effort to fulfill

[its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing

the Guidelines as more than "just one factor among many").  They are significant, because "the

Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted)(quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006)).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349, as recognized in United States v. Zamora-Solorzano, 528 F.3d 1247, 1251, n.3 (10th Cir. 2008).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Rita v. United States, 551 U.S. at 351.  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[4] Guidelines sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States,

---

[4]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The

Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C.  § 3553(e).

> . . . .

> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted).  In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield.  In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v.  Booker-granted authority to post-Guidelines analysis "variances." Irizarry v.  United States, 553 U.S.  708, 710-16 (2008).  A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably.  See Gall v. United States, 552 U.S.  38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30  F. Supp. 3d  1200,  1222-24,  (D.N.M.  June  20, 2014)(Browning, J.)(emphasis in original).

552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-Guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "in a superior position to find facts and judge their import under § 3553(a) in each particular case." Kimbrough v. United States, 552 U.S. at 89. Applying § 3553(a)'s factors, the Court has concluded that the case of an illegal immigrant who re-entered the United States to provide for his two children and two siblings was not materially different from other re-entry cases, and, thus, no variance from the Guidelines sentence was warranted. See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although the defendant's military service was not present to an unusual degree and, thus, did not warrant a departure, the Court concluded that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into

consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute."  530 U.S. at 481 (emphasis in original).  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2012)).  In United States v. Booker, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement."  (second alteration added by United States v. Booker)(quoting United States v. Booker, 543 U.S. at 221).  More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence.  See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005)(McConnell, J.), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis.  See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine.  See United States v. Magallanez, 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount.  See United States v. Magallanez, 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before," United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held

that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United

States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11

F.3d 1510, 1516 (10th Cir. 1993)).[5]   "[T]he application of an enhancement . . . does not implicate

the Supreme Court's holding in *Apprendi v. New Jersey*."   United States v. Reyes-Vencomo, No.

CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.).   The Tenth

Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where

the fact would increase a defendant's sentence "above the statutory maximum permitted by the

statute of conviction."   United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005).   Accord United

States v. Ray, 704 F.3d at 1314.   A defendant may assert an error under Apprendi v. New Jersey

only where the fact at issue increased his sentence beyond the statutory maximum.   See United

---

[5]Although the Tenth Circuit stated in United States v. Washington that "the issue of a
higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth
Circuit has since characterized its holding as leaving "open the possibility that due process may
require proof by clear and convincing evidence before imposition of a Guidelines enhancement
that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704
F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105).  See United States v. Olsen, 519
F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts
that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at
1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants
a higher standard of proof for certain facts that enhance a defendant's sentence.  United States v.
Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof
is required to sentence a defendant for committing perjury in relation to a grand jury investigation,
because the enhancement did not require the district court to determine that the defendant
committed murder, but only that he obstructed a homicide investigation).  See United States v.
Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence
standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225
F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase
in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine
associated with acquitted charges entitled the defendant to a clear-and-convincing evidence
standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this
argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not
find by any more than a preponderance of the evidence the amount of cocaine a defendant
distributed, even though its findings increased the defendant's sentence from twenty years to
consecutive forty-year terms).

States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not

assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory

maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)

(holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need

not be charged in an indictment and need only be proved to the sentencing judge by a

preponderance of the evidence").  The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v.
> United States . . . expands the rule from Apprendi v. New Jersey, . . . (holding that
> facts that increase the maximum sentence a defendant faces must be proven to a
> jury beyond a reasonable doubt), to cover facts that increase the mandatory
> minimum sentence, as well as the maximum sentence, it does not prohibit district
> judges from continuing to find advisory sentencing factors by a preponderance of
> the evidence.  See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL
> 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The

Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the

legally prescribed penalty.' . . . And under our Constitution, when 'a finding of fact alters the

legally prescribed punishment so as to aggravate it[,]' that finding must be made by a jury of the

defendant's peers beyond a reasonable doubt."  United States v. Haymond, 139 S. Ct. 2369, 2378

(2019)(quoting Alleyne v. United States, 570 U.S. at 112-14).  Further, the Tenth Circuit has

determined that a district court could use its own finding on drug quantity to enhance a defendant's

Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its

own drug quantity finding to alter the defendant's *statutory* sentencing range."  United States v.

Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

## LAW REGARDING U.S.S.G. § 2B3.1'S "OTHERWISE USED" ENHANCEMENT

U.S.S.G. § 2B3.1 provides Sentencing Guidelines for the offense of robbery.  See U.S.S.G.

§ 2B3.1.    U.S.S.G. § 2B3.1(b) provides enhancements for certain "Specific Offense

Characteristics."  Specific Offense Characteristics involving the use of a firearm or deadly weapon

are:

> (2)(A) If a firearm was discharged, increase by 7 levels; (B) if a firearm was otherwise used, increase by 6 levels; (C) if a firearm was brandished or possessed, increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4 levels; (E) if a dangerous weapon was brandished or possessed, increase by 3 levels; or (F) if a threat of death was made, increase by 2 levels.

U.S.S.G. § 2B3.1 (b)(2)(A)-(F).  The Commentary to U.S.S.G. § 1B1.1 defines "firearm,"

"dangerous weapon," "brandished," and "otherwise used."  U.S.S.G. § 2B3.1 Application Note 1.

A "firearm" is defined as:

> (i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device.  A weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.

U.S.S.G. § 1B1.1 Application Note 1(H).  A "dangerous weapon" is defined as:

> (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (e.g. a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

U.S.S.G. § 1B1.1 Application Note 1(E).  "Brandished" is defined as:

> "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person.  Accordingly,

although the dangerous weapon does not have to be directly visible, the weapon must be present.[6]

U.S.S.G. § 1B1.1 Application Note 1(C).  "Otherwise used" is defined as: "'Otherwise used' with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon."  U.S.S.G. § 1B1.1 Application Note 1(J).  The Supreme Court notes that the Guidelines' decision to define "'otherwise used'" as "conduct that falls short of 'discharging a firearm but [is] more than brandishing, displaying, or possessing [it]' simply reflects

---

[6]The Sentencing Commission changed the U.S.S.G.'s definition of "brandished" on November 1, 2000.  See United States v. Villar, 586 F.3d 76, 89 n.7 (1st Cir. 2009).  The United States Court of Appeals for the First Circuit explained the changes:

> Prior to November 1, 2000, the Guidelines provided that "brandished" meant that the weapon was "pointed or waved about, or displayed in a threatening manner."  U.S.S.G. § 1B1.1 cmt. n.1(C)(1999)(amended Nov. 1, 2000).  Under that definition, some courts drew a distinction between explicit and implicit threats accompanying the display of a weapon in order to distinguish between "brandish[ing]" and "otherwise us[ing]."  See, e.g., United States v. Moerman, 233 F.3d 379, 380-81 (6th Cir. 2000) (holding that "pointing the firearm in a threatening manner" without the use of verbal threats was "brandish[ing]" of a weapon). The majority of circuits that have analyzed this issue under the amended definition have noted that the explicit/implicit distinction is no longer useful.  Since the amended definition, courts have instead focused on the "specific" as opposed to "general" use of the weapon in determining which enhancement is appropriate.  See generally United States v. Dunigan, 555 F.3d 501, 505 (5th Cir. 2009)(holding that "otherwise use[]" requires that "[t]he threat to the victim must be specific rather than general"); United States v. Paine, 407 F.3d 958, 963-64 (8th Cir. 2005) (concluding that defendant "otherwise used" a weapon when he "employed the gun to convey a threat directed at [a] specific teller which was intended to intimidate her into complying with his demands"); United States v. Orr, 312 F.3d 141, 145 (3d Cir. 2002)("Neither the guidelines nor the caselaw requires . . . a verbalized threat to harm the victim in order to constitute 'otherwise used'").

United States v. Villar, 586 F.3d 76, 89 n.7 (1st Cir. 2009)(brackets in United States v. Villar).

the peculiar hierarchy of culpability established in U.S.S.G. § 2B3.1(b)(2)."  Smith v. United

States, 508 U.S. 223, 232 (1993)(quoting U.S.S.G. § 1B1.1 Application Note 1)(brackets in Smith

v. United States).  The Guidelines

> clarif[y] that between the most culpable conduct of discharging the firearm and less
> culpable actions such as "brandishing, displaying, or possessing" lies a category of
> "other use[s]" for which the Guidelines impose intermediate punishment. It does
> not by its terms exclude from its scope trading, bludgeoning, or any other use
> beyond the firearm's "intended purpose."

Smith v. United States, 508 U.S. at 232 (quoting U.S.S.G. § 1B1.1 Application Note 1).  In United

States v. Gilkey, 118 F.3d 702 (10th Cir. 1997)("Gilkey"), the Tenth Circuit adopts the United

States Court of Appeals for the Third Circuit's analysis of the distinction between brandishing and

otherwise using a weapon as the difference between a generalized and specific threat, respectively.

See Gilkey, 118 F.3d at 706 (quoting United States v. Johnson, 931 F.2d 238, 240 (3rd Cir. 1991)).

The Tenth Circuit explains its decision to affirm the district court's application of U.S.S.G.

§ 2B3.1(b)(2)(D)'s 4-level sentencing enhancement on the grounds that the defendant "otherwise

used" a gun:

> The facts of the case at bar, which include actual, physical seizing of the
> specific victim, the simultaneous pointing of the weapon at the victim, and the
> forced movement of the victim, indicate specific rather than general pointing of the
> gun.  It does not matter whether the gun itself actually touched the victim.

Gilkey, 118 F.3d at 706.  The United States Court of Appeals for the First Circuit cites Gilkey

approvingly for the proposition that "it was the specific rather than the general pointing of the gun

that elevated its use from mere 'brandishment' to 'otherwise used.'"  United States v. LaFortune,

192 F.3d 157, 161 (1st Cir. 1999)(quoting Gilkey, 118 F.3d at 706).  The First Circuit continued:

> As we view it, a person may "brandish" a weapon to "advise" those concerned that
> he possesses the general ability to do violence, and that violence is imminently and
> immediately available.  A general, or even pompous, showing of weapons,
> involving what one would consider an arrogant demonstration of their presence,

> constitutes the generalized warning that these weapons may be, in the future, used and not merely brandished. Altering this general display of weaponry by specifically leveling a cocked firearm at the head or body of a bank teller or customer, ordering them to move or be quiet according to one's direction, is a cessation of "brandishing" and the commencement of "otherwise used."

United States v. LaFortune, 192 F.3d at 161-62 (quoting Gilkey, 118 F.3d at 706).[7]  Other Tenth

Circuit cases discuss "otherwise us[ing]" a weapon in terms of specific threats: in United States v.

Roberts, 898 F.2d 1465 (10th Cir. 1990), for example, the Tenth Circuit concluded that the district

court correctly applied the "otherwise used" enhancement where a defendant "'walked up behind

the victim while holding his knife in his right hand, put his right arm around the victim, and did

hold the knife next to her face and neck . . .' when he demanded money."  United States v. Roberts,

898 F.2d at 1470 (quoting Record).  In United States v. Peraza, 240 F. App'x 788 (10th Cir.

2007)(unpublished)("Peraza"), the Tenth Circuit concluded that a defendant "otherwise used" a

knife when, as well as "mov[ing] the knife from side to side to keep the [bank] tellers at bay," he

---

[7]The First Circuit addresses the question whether, because it analyzes the pre-2000 version of the Guidelines, United States v. LaFortune is still persuasive on this issue:

> Although LaFortune was decided under an earlier version of the guidelines, the parties do not argue that the November 1, 2000 amendment of the Sentencing Guidelines, which changed the definition of "brandished," undermines this Court's holding in LaFortune. The LaFortune court focused on the "specific[] leveling" of a weapon at another person as opposed to a "general display of weaponry" as the demarcation between "brandish[ing]" and "otherwise us[ing]." 192 F.3d at 161. As such, the reasoning in LaFortune is fully consistent with the amended definition of "brandished." Compare U.S.S.G. § 1B1.1 cmt. n.1(C)(1999)(describing a brandished weapon as one that was "pointed or waved about") with U.S.S.G. § 1B1.1 cmt. n.1(C)(2008)(defining "brandish[ing]" as the "display" of the weapon, or whether "the presence of the weapon was otherwise made known to another person").

United States v. Villar, 586 F.3d 76, 90 (1st Cir. 2009)(citing United States v. LaFortune,192 F.3d at 161).

also "'held the knife close to the teller . . . in a threatening manner to ensure neither [the teller], nor the other tellers attempted to interfere with the robbery.'"   Peraza, 240 F. App'x at 790-91 (quoting the defendant's Presentence Report).

The Courts of Appeals that have considered this question are in broad agreement that the difference between brandishing a weapon and otherwise using it is whether a threat is generalized or specific.  See United States v. Villar, 586 F.3d 76, 90 (1st Cir. 2009)(holding that the defendant's use of the weapon "to make an unmistakably clear and specific threat falls within the definition of 'otherwise used'"); United States v. Speed, 636 F. App'x 9, 13 (2nd Cir. 2015)(holding that the district court did not err in determining that the defendant "'otherwise used' a firearm when he pressed it into his victim's neck and threatened to kill him, and did not merely brandish it")(quoting U.S.S.G. § 2B3.1(b)(2)); United States v. Bell, 947 F.3d 49, 61-62 (3d Cir. 2020)(reaffirming United States v. Johnson, 199 F.3d 123, 127 (3d Cir. 1999), by concluding that specifically pointing a weapon at a person and ordering them to do something is no longer brandishing); United States v. Orr, 312 F.3d 141, 145 (3d Cir. 2002)("Neither the guidelines nor the caselaw requires infliction of . . . violent physical contact . . . or a verbalized threat to harm the victim in order to constitute 'otherwise used.'")(quoting U.S.S.G. § 2B3.1(b)(2)); United States v. Kiel, 658 F. App'x 701, 714 (5th Cir. 2016)(following United States Court of Appeals for the Fifth Circuit's precedent in holding that "[d]isplaying a weapon without pointing or targeting should be classified as 'brandished,' but pointing the weapon at any individual or group of individuals in a specific manner should be 'otherwise used'")(quoting United States v. Dunigan, 555 F.3d 501, 505 (5th Cir. 2009)(quoting U.S.S.G. § 2B3.1(b)(2)); United States v. Johnson, 456 F. App'x 540, 543 (6th Cir. 2012)(reviewing Sixth Circuit precedent that "distinguish[es] between displaying a firearm with an intent to intimidate, which is brandishing, and pointing a firearm at an individual and

making a demand, which constitutes use beyond brandishing" (citing United States v. Bolden, 479 F.3d 455, 461 (6th Cir. 2007); United States v. Winters, 247 F. App'x 665, 669-70 (6th Cir. 2007)); United States v. Kruger, 839 F.3d 572, 578-79 (7th Cir. 2016)(finding that "otherwise used" requires "conduct that 'create[s] a personalized threat of harm'. . . as when the defendant levels a gun at a specific individual and in some way conveys a threat, explicit or implicit, that he will inflict harm on that person if she does not cooperate with him . . ." (quoting United States v. Eubanks, 593 F.3d 654, 651 (7th Cir. 2010), and citing United States v. Hernandez, 106 F.3d 737, 741 (7th Cir. 1997)); United States v. Warren, 279 F.3d 561, 562-63 (7th Cir. 2002)(holding that "physical contact between the weapon and the victim is not a prerequisite to finding that the defendant 'otherwise used' a dangerous weapon")(quoting U.S.S.G. § 2B3.1(b)(2)); United States v. Paine, 407 F.3d 958, 964 (8th Cir. 2005)(upholding the "otherwise used" enhancement where the defendant used a gun "to convey a threat directed at [a] specific teller which was intended to intimidate her into complying with his demands"); United States v. Elkins, 16 F.3d 952, 953-54 (8th Cir. 1994)(finding that the district court did not err in applying the 4-level enhancement where the defendant "plac[ed] a knife against the throat of an innocent bystander to facilitate cooperation with a robbery demand"); United States v. Albritton, 622 F.3d 1104, 1107 (9th Cir. 2010)(affirming the district court's decision that the defendant "otherwise used" a BB pistol where the defendant "pointed the [BB] pistol directly at the teller and ordered her 'Down, Down!'" and where the defendant "specifically leveled the weapon at loan officer Zeiss in directing her across the room")(no citation for quotation); Gilkey, 118 F.3d at 706 ("The facts of the case at bar . . . indicate specific rather than general pointing of the gun"); United States v. Johnson, 803 F.3d 610, 617-18 (11th Cir. 2015)(finding that a weapon can be "otherwise used" without threatening one individual specifically, and rejecting the defendant's argument that he only brandished and did not

otherwise use his pistol when "he did not threaten a specific person or point his pistol at a specific person," but "collectively threatened a specific group of tellers and pointed his firearm at all of them"); United States v. Douglas, 489 F.3d 1117, 1128-29 (11th Cir. 2007)(holding that the district court properly applied the otherwise used enhancement where the defendant held firearm at his groin area and did not point it at victim, but did verbally threaten the victim).  See also United States v. Baca, 350 F. Supp. 3d 1164, 1182 (D.N.M. 2018)(Browning, J.)(concluding that, if the defendant had intentionally or recklessly pointed a laser at the aircraft, U.S.S.G. § 2A5.2's "otherwise used" enhancement would have applied).

## ANALYSIS

Ortiz "otherwise used" his BB gun pursuant to U.S.S.G. § 2B3.1(b)(2)(D).  In Gilkey, the Tenth Circuit adopted the Third Circuit's analysis of the distinction between "brandishing" and "otherwise us[ing]" a weapon as the difference between a generalized and specific threat, respectively.  U.S.S.G. § 2B3.1(b)(2).  See Gilkey, 118 F.3d at 706 (quoting United States v. Johnson, 931 F.2d at 240).  The Tenth Circuit concluded that the co-defendant "otherwise used" a gun, because "[t]he facts of the case at bar . . . include actual, physical seizing of the specific victim, the simultaneous pointing of the weapon at the victim, and the forced movement of the victim . . . ."  Gilkey, 118 F.3d at 706.  These facts "indicate specific rather than general pointing of the gun," and "[i]t does not matter whether the gun itself actually touched the victim."  Gilkey, 118 F.3d at 706.  The Tenth Circuit explained that the co-defendant

> did not merely point, wave about, or display the weapon in a threatening manner. Instead, he (1) pointed it at the victims, (2) used it to threaten them, (3) pointed it at one victim's head while grabbing and lifting her by the neck and demanding money, and (4) grabbed another victim, forced him to an office area while pointing the gun at him, and demanded that he open the safe and provide money.

Gilkey, 118 F.3d at 705.  Moreover, in United States v. Roberts, the Tenth Circuit held U.S.S.G.

§ 2B3.1(b)(2)(D)'s "otherwise used" enhancement applies where a defendant "'walked up behind

the victim while holding his knife in his right hand, put his right arm around the victim, and did

hold the knife next to her face and neck . . .' when he demanded money."  United States v. Roberts,

898 F.2d at 1470 (no citation for quotation).  Further, in Peraza, 240 F. App'x 788, the Tenth

Circuit concluded that a defendant "otherwise used" a knife when, as well as "mov[ing] the knife

from side to side to keep the [bank] tellers at bay," he also "'held the knife close to the teller . . .

in a threatening manner to ensure neither he, nor the other tellers attempted to interfere with the

robbery.'"  Peraza, 240 F. App'x at 790-91.

Here, Ortiz pointed a dangerous weapon at both A.M. and R.M., and ordered them to give

him the keys to A.M.'s BMW: Ortiz "opened the unlocked driver's side door of A.M.'s vehicle

and pointed a black [BB gun] at R.M., while demanding the keys."  PSR ¶ 7, at 3.  See PSR ¶ 9,

at 4.  When A.M. opened the laundromat door, Ortiz "pointed [the BB gun] at A.M.'s chin and

demanded his keys."  PSR ¶ 6, at 3.  A.M. gave Ortiz the keys and told R.M. to get out of the car.

See PSR ¶ 6, at 3.  Ortiz took the keys, got in the vehicle, and "fled . . . westbound on Central."

PSR ¶ 7, at 3.  Although "[n]either A.M. nor R.M. were injured," "they thought the suspect was

going to shoot them when the handgun was pointed at them."  PSR  ¶ 7, at 3.

Ortiz argues that the "requirement of proportionality" supports only a 3-level enhancement,

and contrasts his use of the BB gun with a "typical otherwise used case . . . where the . . . gun was

used as a club to 'pistol whip' the victim."  Objections ¶ 6, at 2 (no citation for quotation).  Ortiz

argues that such conduct is more egregious than his actions, and that he should not receive the

same sentence as someone who engages in that egregious conduct.  See Objections ¶ 6, at 2-3.

The Court agrees that Ortiz' conduct is less egregious than that of a defendant who pistol-whips a

victim and is also less egregious than the co-defendant in <u>Gilkey</u>, who grabbed the victim and almost lifted her off the ground while pointing a gun at her head.  <u>See</u> <u>Gilkey</u>, 118 F.3d at 705-06. There is no mention of a proportionality requirement in U.S.S.G. § 2B3.1, however, nor in the Guidelines' Commentary or Application Notes.  Ortiz invites the Court to create some free-wheeling principle to reduce the Guidelines on some subjective comparison of egregiousness.  The Guidelines' introductory notes do not contemplate such a principle, so the Court will not create one.

In enacting the Sentencing Guidelines, "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders," and "sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."  United States Sentencing Guidelines Manual § 1A at 3 (U.S. Sentencing Commission 2021)("U.S.S.G. Manual").  Despite the Guidelines' twin goals of uniformity and proportionality, "[t]here is a tension . . . between the mandate of uniformity and the mandate of proportionality."  U.S.S.G. Manual § 1A at 3.  The U.S.S.G Manual explains:

> Simple uniformity -- sentencing every offender to five years -- destroys proportionality.  Having only a few simple categories of crimes would make the guidelines uniform and easy to administer, but might lump together offenses that are different in important respects.  For example, a single category for robbery that included armed and unarmed robberies, robberies with and without injuries, robberies of a few dollars and robberies of millions, would be far too broad.

U.S.S.G. Manual § 1A at 3.  The U.S.S.G. Manual explains that a "sentencing system tailored to fit every conceivable wrinkle of each case would quickly become unworkable and seriously compromise the certainty of punishment and its deterrent effect," and gives as an example

> a bank robber with (or without) a gun, which the robber kept hidden (or brandished), might have frightened (or merely warned), injured seriously (or less

> seriously), tied up (or simply pushed) a guard, teller, or customer, at night (or at
> noon), in an effort to obtain money for other crimes (or for other purposes), in the
> company of a few (or many) other robbers, for the first (or fourth) time.

U.S.S.G. Manual at 3.  The Sentencing Commission found "no completely satisfying solution,"

but, rather, attempted to "balance the comparative virtues and vices of broad, simple categorization

and detailed, complex subcategorization, and within the constraints established by that balance,

minimize the discretionary powers of the sentencing court.  Any system will, to a degree, enjoy

the benefits and suffer from the drawbacks of each approach."  U.S.S.G. Manual at 4.  Despite the

Guidelines' broad goals of proportionality and uniformity, however, there is no proportionality

requirement.

The Honorable Marsha Berzon, United States Circuit Judge for the Ninth Circuit, in her

dissent to United States v. Albritton, see 622 F.3d at 1109-12, articulates an argument similar to

Ortiz' argument that the "typical otherwise used case" is a pistol-whipping case, Objections ¶ 6,

at 2.  Judge Berzon states that she would "hold that pointing a BB pistol at someone, coercively or

otherwise, constitutes brandishing, not otherwise using, the weapon, giving rise to a three -- rather

than four -- level sentencing enhancement."  622 F.3d at 1112.  She states:

> For dangerous weapons other than firearms, my understanding of "brandished"
> leaves "otherwise used" covering all the ordinary uses of most dangerous weapons
> that are not firearms -- stabbing with a knife, for example, or cutting with an axe,
> or hitting with a hammer. And for firearms, "otherwise used" would include, for
> example, pistol whipping.

United States v. Albritton, 622 F.3d at 1111-12 (Berzon, J., dissenting)(quoting U.S.S.G. § 1B1.1).

Judge Berzon disagrees with the majority's suggestion that "the current Guidelines' definition of

'brandished' cannot include pointing a weapon at someone, because earlier versions of the

definition expressly included 'pointing,' while the current one does not."   United States v.

Albritton, 622 F.3d at 1110 (Berzon, J., dissenting)(quoting U.S.S.G. § 1B1.1).  Judge Berzon

writes instead, that the "more appropriate conclusion is that the term 'display' now includes both waving *and* pointing." United States v. Albritton, 622 F.3d at 1110 (Berzon, J., dissenting)(quoting U.S.S.G. § 1B1.1)(emphasis in original).

Here, Ortiz did not merely point the BB gun, he also issued a command directed at specific individuals. See PSR ¶¶ 6-7, at 3. The Court agrees with the Seventh Circuit that "physical contact between the weapon and the victim is not a prerequisite to finding that the defendant 'otherwise used' a dangerous weapon." United States v. Warren, 279 F.3d at 562-63. Moreover, although there is no evidence that Ortiz touched the victims, he pointed the BB gun directly at A.M.'s chin and demanded the car keys. See PSR ¶ 6, at 3. Ortiz' behavior rises above the level of mere brandishing: although Ortiz did not have physical contact with his victims, he did not "merely point, wave about, or display the weapon in a threatening manner;" instead, he "pointed it at one victim's head" and "demanded that" the victim hand over the car keys. Gilkey, 118 F.3d at 705. See PSR ¶¶ 6-7, at 3. Like the defendant in Peraza, Ortiz "'held the [BB gun] close to [A.M.] . . . in a threatening manner to ensure" that the victim complied with his request. 240 F. App'x at 790-91. See PSR ¶¶ 6-7, at 3. Because Ortiz did not merely display the BB gun "without pointing or targeting," but "point[ed] the weapon at an[] individual . . . in a specific manner," he otherwise used the BB gun. United States v. Kiel, 658 F. App'x 701, 714 (5th Cir. 2016)(quoting United States v. Dunigan, 555 F.3d 501, 505 (5th Cir. 2009)). Ortiz' decision to point the BB gun directly at A.M.'s face while demanding the victim's car keys created a specific -- albeit implicit -- threat. See United States v. Johnson, 199 F.3d at 127. Ortiz created a "'personalized threat of harm,'" because Ortiz "levels a gun at a specific individual and in some way conveys a threat, explicit or implicit, that he will inflict harm . . . on that person if she does not cooperate with him." United States v. Kruger, 839 F.3d at 578-79 (quoting United States v. Eubanks, 593

F.3d at 651)).  Because Ortiz used the BB gun to create a specific threat of harm, and not merely

a generalized one, he "otherwise used" his BB gun within U.S.S.G. § 2B3.1(b)(2)(D)'s meaning.

Consequently, the Court overrules Ortiz' Objections and applies U.S.S.G. § 2B3.1(b)(2)(D)'s 4-

level enhancement.

IT IS ORDERED that: (i) the Defendant's Objections to the Presentence Report and

Sentencing Memorandum, filed December 7, 2021 (Doc. 34), are overruled; and (ii) Ortiz' Offense

Level is 23, his Criminal History Category is III, and the Guidelines range is 57 months to 71

months.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Fred J. Federici
  Acting United States Attorney
John K. Stanford
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

    *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
John V. Butcher
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

    *Attorneys for the Defendant*